Moreover, in as much as the evidence provided by Plaintiff is unsupported by anything other than her own allegations, it is of little value. Flynn, 377 F.3d at 21 ("opinion testimony by a [party] is considered self-serving and of little probative value.").

In sum, Plaintiff has failed to demonstrate that the public associates the words "Social Savvy" when used in a book title or otherwise exclusively with her. Indeed, where as here a defendant has provided evidence of significant third-party usage of the disputed mark, no effective secondary meaning can be obtained by the plaintiff. See Labrador, 32 F. Supp. 2d at 34 ("that several other internet-related companies used marks similar or identical to Plaintiff's marks further indicates that Plaintiff's limited use did not give the marks secondary meaning"); MCCARTHY ON TRADEMARKS § 15:27 ("[w]idespread use [of marks] by third parties is… evidence in support of a lack of secondary meaning."). Accordingly, even if the Court finds that Plaintiff's "mark" is descriptive, it should rule as a matter of law that it is unprotectable.

## POINT II

## PLAINTIFF FAILS THE LIKELIHOOD OF CONFUSION TEST

Even if Plaintiff could demonstrate ownership of a protectable mark, this action must fail as a matter of law because Plaintiff cannot meet her burden of proving that the complained of use is likely to cause confusion, an essential element of a claim for trademark infringement. See Leathersmith, 695 F.2d at 29 (affirming summary judgment for defendant, holding that "plaintiff

---

area of audio books, there is not adequate evidence of record to establish that these advertising and promotional efforts have resulted in the recognition of "audio book club" as an indicator of the source of these services, rather than as the name of this new category of "book club" services. Here, as in many prior cases, we find the extent of expenditures and promotion indicative only of an applicant's attempts to develop distinctiveness, rather than the achievement of the same"); In Re Recorded Books, Inc., 1997 WL 196608 at *8, 42 U.S.P.Q.2d 1275, 1282 (T.T.A.B. 1997). In these two cases, moreover, the applicants submitted scores of news articles about the applicants and letters from consumers addressed to the plaintiff using the term sought to be registered. Nevertheless, the registrations were denied because, as here, at most the applicant had shown only that a "small subset of purchasers," not the "average purchaser," views the proposed term as an indicator of the source for applicant's goods. 42 U.S.P.Q.2d at 1282.

15

has the burden of showing [confusion] -- which is not a defense but an essential element of the claim of infringement.")[6]

A plaintiff has a much higher burden when the allegedly infringing goods are books. Because an author has a "significant First Amendment interest in choosing an appropriate title for his or her work", any finding of confusion must be "particularly compelling." Twin Peaks, 996 F.2d at 1379. See also SugarBusters, 177 F.3d at 269, n.7 ("any finding that defendants' book title is likely to cause confusion with plaintiff's book title must be 'particularly compelling' to outweigh defendants' First Amendment interest in choosing an appropriate book title for their work."). The determination of whether Plaintiff has made a particularly compelling showing of likelihood of confusion that outweighs the public interest in free expression must be made in the first instance by application of the eight factor test. Twin Peaks, 996 F.2d at 1379. See also Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981). In addition, Plaintiff must prove that the likelihood of confusion is *substantial* -- the mere possibility or simple likelihood of confusion is insufficient to establish a trademark claim. Pump, Inc. v. Collins Management, Inc., 746 F. Supp. 1159, 1165 (D. Mass. 1990).

The First Circuit has frequently upheld the grant of summary judgment for defendants in trademark cases where the plaintiff cannot meet its burden of establishing a likelihood of confusion. See e.g., CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc., 97 F.3d 1504, 1527 (1st Cir. 1996); Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1209 (1st Cir. 1983); Pignons, 657 F.2d at 492. Here, Plaintiff cannot establish a

---

[6] Plaintiffs that own a trademark registration, even one that is incontestable, must still meet the same burden of demonstrating likelihood of confusion. See DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 606 (1st Cir. 1992) (holding that "the statute nowhere says that registration makes it easier for a registrant . . . to prove that a relevant buying public may confuse some other person's mark with his own."); 15 U.S.C. § 1115(b).

16

likelihood of confusion under the eight factor analysis. Accordingly, this Court should grant summary judgment in Defendants' favor.

### Similarity of Marks

The first factor identified by the First Circuit is the similarity of the marks. Pignons, 657 F.2d at 487. Whether the marks are determined to be similar is determined based upon "the total effect of the designation, rather than a comparison of individual features." Id. See also Astra, 718 F.2d at 1205. Moreover, where the "marks in dispute are common words with well-known meanings, relatively slight differences in sound or appearance suffice to avoid conflict . . . ." Richard L. Kirkpatrick, Likelihood of Confusion in Trademark Law § 4:3.1 (Practicing Law Institute) (2004). With respect to books, courts deem differences in the designs, colors, words and word size on book covers to be significant in the likelihood of confusion analysis. See, e.g., Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc., 886 F.2d 490, 496 (2d Cir. 1989); Field Enterprises Educ. Corp. v. Grosset & Dunlap, Inc., 256 F. Supp. 382, 387-88 (S.D.N.Y. 1966).

Defendants' use of "social savvy" as part of a composite phrase is distinct in sound, meaning and appearance from Plaintiff's use of "social savvy" in her out of print book or in connection with her seminars. For example, Plaintiff begins her book title with the phrase "Social Savvy."[7] Defendants' books, on the other hand, begin with "The Girl's Guide" and "The Guy's Guide" -- placing the emphasis on the target audience for each book. Kahn Aff., Ex. J. Plaintiff's book uses the phrase "social savvy" in connection with "Teenagers." Defendants' book titles do not mention teenagers. Plaintiff's title includes a focus on "Feeling Confident."

---

[7] Plaintiff's book was printed in hardcover and later in softcover. See Kahn Aff., Exs. H and I. Although the text on the front of each cover differs slightly, both covers are dissimilar in all respects to Defendants' books. For the purposes of this motion, we refer to the hardcover edition of Plaintiff's book.

Defendants' titles do not refer to developing confidence in the books' readers, and instead directly below the phrase "social savvy" include the words "Manners for the Modern World."

Another significant factor in distinguishing the books is the placement of the authors' names in close proximity to the titles. On the front cover of Defendants' The Girl's/Guy's Guides, the phrase "social savvy" appears close to Smith's name. Plaintiff's book title appears in connection with Plaintiff's name and the name of the writer of her book, Meg F. Schneider. Where otherwise similar marks are used in the presence of the clearly displayed name of the source, in this case the author, there is less likelihood of confusion. See Pignons, 657 F.2d at 487.

The parties' respective uses of "social savvy" are also dissimilar in the design and layout of the titles, further militating against a likelihood of consumer confusion. The phrase "social savvy" appears in initial caps on the front cover of The Girl's/Guy's Guides. "Social savvy" is written in gold in a script-like font and the letters are approximately the same size as the rest of the title. The book covers are red for The Girl's Guide and blue for The Guy's Guide, respectively.

In contrast, Plaintiff's book contains the phrase "social savvy" written in all blue capital letters on a white background at the top of the cover. The word "social" is substantially larger than "savvy" which, in turn, is larger than the rest of the title.

With respect to Plaintiff's seminar services, Plaintiff's use of the phrase is varied and inconsistent. Plaintiff does not use the phrase as a business title, but rather in connection with seminars. For example, one use of "social savvy" by Plaintiff is a schedule titled "A Day of Social Savvy with Judith Re at the Ritz-Carlton, Boston." Kahn Aff., Ex. K. Another example is an invoice on letterhead titled "JRA, The Judith Re Academie Instruction in Business Etiquette

and Social Savvy®" Kahn Aff., Ex. L. Still another has the same letterhead without the words "Social Savvy" in the title but rather within the body of the invoice. Kahn Aff., Ex. M. Based on these examples, Plaintiff has failed to use "social savvy" in a consistent, source indicating manner, and consumers would not be likely, therefore, to view the phrase as a trademark indicating Plaintiff's business. In any event, Plaintiff's use of the phrase "social savvy" for her seminars is in all respects distinct from Defendants' use of the phrase in connection with Defendants' books.

Given the significant differences in sound, meaning and appearance of the parties' respective composite titles that contain the words "social savvy", the fact that the phrase "social savvy" is a common phrase not likely to grab the consumer's attention, and the fact that the book titles appear in close proximity to the authors' names -- it is highly unlikely that a consumer will be confused as to source. This factor favors Defendants.

### Similarity of Goods

The second factor to be considered is whether the goods and services are similar. Defendants do not use "social savvy" in connection with seminars or the etiquette business generally. With respect to the books at issue, there are significant differences that should militate against confusion. The target audience for Defendants' books are adults in their 20s and 30s. Einhorn Dep. at 85. Plaintiff's book is written for children or their parents (Ré Dep. at 49) and has the term "Teenager" in the title. The fact that the goods at issue are books does not mean that the goods are similar under this prong of the confusion test. Category similarities may be insufficient to establish similarity of goods. See e.g. Pignons, 657 F.2d at 487-488 (products at issue were both cameras but had little else in common). Therefore, because of the distinct

19

differences in the books, and the fact that Defendants do not use the phrase in connection with any other facet of the etiquette business, this factor weighs in favor of Defendants.

## Channels of Trade, Advertising and Prospective Purchasers

Because the relationship between the parties' channels of trade; the relationship between the parties advertising; and the classes of prospective purchasers are interrelated, they are often considered together. Pignons, 657 F.2d at 488. Smith does not use the phrase "social savvy" to promote or market her etiquette services, which are directed toward adults at corporations, universities and professional organizations.

Plaintiff primarily uses the phrase "social savvy" in connection with providing etiquette services to children and teens. Her book title Social Savvy - A Teenager's Guide to Feeling Confident in any Situation and her service mark registration, which indicates that the service provided is "conducting training programs and educational classes in teaching young people the social graces," make this clear. The subject matter of Plaintiff's book underscores that teens are her targeted readers, as she addresses such issues as parents not liking your friends, negotiating an allowance, and babysitting tips. Thus, Plaintiff's prospective purchasers are children and the parents of children. Ré Dep. at 49. Defendants' books, on the other hand, are directed toward adults in their 20s and 30s. Einhorn Dep. at 85. See Scholastic Inc. v. Stouffer, No. 02-9405, 2003 WL 22850111, *1 (2d Cir. Dec. 2, 2003) (no likelihood of confusion found where readers of plaintiff's book were primarily older children and adults while readers of defendant's book were primarily young children).

Significantly, Plaintiff's book is currently out of print. Ré Dep. at 64. The book is only available for sale in remainder and bargain book bins, and can be purchased online for as low as

20

one cent.[8] In contrast, The Girl's/Guy's Guides are currently available through the usual retail channels. It is unlikely that a consumer of Plaintiff's children/teen oriented etiquette services, whether in connection with her out of print book and seminars, would purchase Defendants' adult guides to social savvy.

Finally, book purchasers typically exercise a reasonable degree of care in the selection of books. See Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 72 (2d Cir. 1994) (even inexpensive dictionaries attracted sophisticated purchasers); Girl Scouts of the U.S. v. Bantam Doubleday Dell Publishing Group, Inc., 808 F. Supp. 1112, 1130 (S.D.N.Y. 1992) ("purchasers of children's books are undoubtedly literate; moreover, undoubtedly they have in mind supplying quality reading material to [their children]" and are thus not unsophisticated). Purchasers typically evaluate books at the time of purchase to determine which books contain the subject matter that is of interest to the purchaser, and often buy a book based on a review or recommendation. See Cliffs Notes, Inc., 886 F.2d at 496 ("A prospective reader of Cliffs Notes probably has a specific book in mind when going to the bookstore for a study guide.") Clearly, given the differences between the uses of the phrase, as outlined above, and the purchaser's ability to review and evaluate the differences between the books and their respective authors, it is further unlikely that consumer confusion could exist. Therefore, this factor favors the Defendant.

### Evidence of Actual Confusion

Plaintiff points to three instances where she claims that there was actual confusion between the Girl's/Guy's Guides and Plaintiff or her book. First, Plaintiff's assistant's mother allegedly heard Smith on the radio discussing the Girl's/Guy's Guides and thought she was

---

[8] Smith testified that she bought a copy of Plaintiff's book in 1999 for $1.00 at a remainder store called "Buck-a-Book." Smith Dep. at 141. Smith added Plaintiff's book to her collection of etiquette books, but had not read Plaintiff's book other than skimming it years before writing the Girl's/Guy's Guides. Smith Dep. at 43-44.

Plaintiff. Her confusion was dispelled when she spoke with her daughter. Ré Dep. at 102-3. Plaintiff also indicates that B&N information desk employees were confused after being asked by Plaintiff (on one occasion) and Plaintiff's daughter and mother (on another occasion) if the store carried any "Social Savvy" books and responded that there were three books containing the words "Social Savvy." Ré Dep. at 103-106. These purported examples of confusion have no relevance for several reasons. First, the latter two incidents are not examples of confusion at all, but rather a clerk running a search on book titles containing the phrase "social savvy" and reporting on the results. Second, "the relevant type of confusion is that which occurs among the purchasers of a product or service." CCBN.com, Inc. v. c-call.com, Inc., 73 F. Supp. 2d 106, 113 (D. Mass. 1999), citing Astra, 718 F.2d at 1206. Third, *de minimus* confusion such as that offered by Plaintiff here which is easily resolved and does not affect the ultimate purchase decision is of minimal relevance. Id. Fourth, the only person confused was Plaintiff's assistant's mother. Where the purportedly confused person is acquainted with the plaintiff, her testimony of confusion is less probative. Pump, 746 F. Supp. at 1165. The absence of any actual, relevant confusion is highly relevant to finding that there is no likelihood of confusion. Pignons, 657 F.2d at 490; Pump, 746 F. Supp. at 1169. Accordingly, this factor favors Defendants.

### Intent on Adopting the Mark

B&N titled the books The Girl's Guide to Social Savvy and The Guy's Guide to Social Savvy because they wanted hip and catchy titles. Einhorn Dep. at 39-42. At the time the titles were conceived by B&N's editor, B&N was unaware of Plaintiff's book. Einhorn Dep. at 67.[9] After seeing B&N's title choice, Smith recalled that Plaintiff had published a book that contained

---

[9] After she selected the titles, on a visit to a bookstore, Einhorn first became aware of Plaintiff's book. She did not pick up, review, skim, or purchase Plaintiff's book, and was not concerned about the use of the phrase "social savvy" as part of the title because it was her understanding that a book title could not be legally protected. Einhorn Dep. at 68-69.

the phrase "social savvy" and brought that fact to the attention of B&N. It is generally known in the publishing industry that book titles are not entitled to protection. Einhorn Dep. at 81-85. B&N reasonably concluded that the use of the phrase, which had been conceived without any knowledge of Plaintiff's book or Plaintiff's trademark registration, was not violative of Plaintiff's rights and should be used on Defendants' book. Id.; Smith Dep. at 61-66. Thus, there is no evidence of bad faith or intent to trade-off of Plaintiff's mark. This factor, therefore, favors Defendants. See Astra, 718 F.2d at 1208 (bad faith will not be presumed where the initial choice of the mark is arrived at independently); Pignons, 657 F.2d at 491 (factor weighed in favor of defendant where plaintiffs adduced no evidence of an intent to deceive or benefit from plaintiffs' reputation).

### **Strength of Mark**

Strong marks receive greater protection against infringement than weak marks. See, e.g., Pignons at 657 F.2d at 492. As demonstrated above, the phrase "social savvy" is a very weak mark for many reasons, including (i) it takes no imagination to understand that the phrase refers to etiquette, social graces or similar behavior; (ii) it is used extensively in the etiquette field by third parties both as a title for seminars, in book titles, within the text of etiquette books and on web sites (See Braverman Aff. at 7-23, Exs. 4-7); (iii) it is used hundreds of times in connection with some element or aspect of etiquette, social graces or similar behavior (Braverman Aff. at 7-38, Exs. 4-8); (iv) the phrase is used by Plaintiff as part of a title of a book that is out of print and as the name of the course that is offered in limited locations; (v) "social savvy" is not even the name of Plaintiff's company, which is the Judith Ré Academie; (vi) Plaintiff has spent no money on advertising with respect to the mark and does not conduct formal activities to police it from infringing third party uses. This important factor also favors Defendants.

23

In sum, in weighing the relevant factors above, there is no likelihood of confusion, and Plaintiff's trademark claims should be dismissed on this alternative ground.

### POINT III

### Defendants' use of the Common Words "Social Savvy" is protected under the fair use doctrine

The fair use defense is set forth in 15 U.S.C. § 1115(b)(4), and provides a complete defense to a claim for trademark infringement where, "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark ... of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party..." 15 U.S.C. § 1115(b)(4). Even if the Court finds that Plaintiff has cleared the hurdles of establishing that she has a protectable mark and proffering evidence supporting a particularly compelling finding of a likelihood of confusion, the fair use defense permits this Court to rule that Plaintiff's trademark claims fail as a matter of law.

Fair use, as applied to trademark law, ensures that a descriptive term can always be used by others to describe their goods or services. See WCVB-TV v. Boston Athletic Ass'n., 926 F.2d 42, 46 (1st Cir. 1991) ("the use of words for descriptive purposes is called a 'fair use,' and the law usually permits it even if the words themselves also constitute a trademark"); MCCARTHY ON TRADEMARKS §11:45 ("[t]he original, descriptive primary meaning is always available for use by others to describe their goods, in the interest of free competition"). The defense is available even as against marks that have become incontestable. Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 12 (2d Cir. 1976). A defendant may rely on fair use as a defense even if some confusion is likely. RESTATEMENT (THIRD) OF UNFAIR COMPETITION §28 at 295.

24

Courts frequently grant summary judgment in a defendant's favor on the basis of the "fair use" defense. See, e.g., Leathersmith, supra (1st Cir. 1982) (summary judgment for defendant affirmed on alternative grounds of both failure to prove likelihood of confusion and fair use); ETW Corp. v. Jireh Publishing, Inc., 332 F.3d 915, 920-21 (6th Cir. 2003) (affirming grant of summary judgment in defendant's favor on the basis of fair use); Cairns v. Franklin Mint Co., 292 F.3d 1139, 1150-55 (9th Cir. 2002) (same); Packman v. Chicago Tribune Co., 267 F.3d 628, 639-43 (7th Cir. 2001) (same); Microware Systems Corp. v. Apple Computer, Inc., 238 F.3d 989, 990 (8th Cir. 2001) (same).

Here, Defendants did not use the phrase "Social Savvy" as a trademark, but rather as a generic description of the contents of the Girl's/Guy's Guides.[10] The term "Social Savvy" was chosen as part of the titles of the Girl's/Guy's Guides in order accurately to communicate the subject matter of the books. Einhorn Dep. at 40-42. Defendants believed "social savvy" was a generic term used frequently in the etiquette field and never sought to register the term "Social Savvy." Smith Dep. at 117, 119. See Zatarains, Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 796 (5th Cir. 1983) (that defendants' use of the words "fish fry" was fair and in good faith was evidenced by the fact that they had no intention to use the term in a trademark sense, had never attempted to register the words as a trademark, and apparently believed "fish fry" was a generic name for the type of coating mix they manufactured).

Nothing about Defendants' use of the phrase "social savvy" indicates an intent "basically, and primarily, to make clear to the customer the origin of the goods or the services." WCVB-TV, 926 F.2d at 44. The fact that the words are in a different font and color from the rest of the title does not suggest that the phrase is being used a trademark. Eli Lilly and Co. v. Revlon, Inc.,

---

[10] Indeed, book titles are often chosen precisely *because* they describe the contents of the book. As set forth in Point I(C), supra, it is for this reason that the Courts do not allow the registration of a single book title.

25

577 F. Supp. 477, 486 (S.D.N.Y. 1983) ("[e]mphasis of a descriptive term on packaging does not show that the term is being used as a trademark"); Schmid Laboratories v. Youngs Drug Products Corp., 482 F. Supp. 14, 20-21 (D.N.J. 1979) ("the fact that 'RIBBED' is used by defendant 'as a symbol to attract public attention' does not mean it is being used a trademark. Virtually every aspect of a product's trade dress is intended to catch the eye of the purchaser. Unless attention is drawn to the particular word or term as being indicative of source of origin of that product, the term is not being used as a trademark").

The First Circuit's decision in Leathersmith is directly on point. Plaintiff Leathersmith of London, Ltd. marketed leather products in the United States, including Massachusetts, under the registered trademark "Leathersmith." Plaintiff brought suit under the Lanham Act for infringement of this trademark against defendant, a leather craftsman and bookbinder, who had been doing business in Massachusetts as "TANTALUS Custom Leathersmiths & Bookbinders." The First Circuit found that defendant's use constituted a protected fair use since (i) he did not adopt "Leathersmith" as a trade or service mark, but rather as a generic description of his craft; and (ii) his good faith in adopting the term and lack of any intent to deceive plaintiff's customers or appropriate plaintiff's good will was supported by his affidavit and was "not contravened by anything else, and is binding." 695 F.2d at 30-31. The court emphasized that "'Leathersmith' can easily be such a description of the craft of working with leather; it is a combination of the ordinary words 'leather' and 'smith,' comparable to 'tunesmith' 'jokesmith', songsmith', and 'wordsmith'." Id.

Just as in Leathersmith, Defendants here have offered proof that their intent was to use "social savvy" in the titles of the Girl's/Guy's Guides as a synonym for etiquette, i.e., a generic description of the subject matter of the books and not as a trademark. Einhorn Dep. at 39-42. In

26

addition, "social savvy" just like "Leathersmith" is a combination of ordinary words, comparable to a host of other combinations such as "business savvy", "political savvy," and "financial savvy". Accordingly, the fair use defense is equally applicable here.

The fact that Defendants may have known that Plaintiff had used "social savvy" prior to the printing of the Girl's/Guy's Guides does nothing to help Plaintiff's case as knowledge of another's use of a mark does not show bad faith. Car-Freshner Corp. v. S.C. Johnson & Son, Inc., 70 F.3d 267, 270 (2d Cir. 1995) (defendant's knowledge of plaintiff's use of a pine-tree shaped air freshener and failure to consult counsel on the propriety of defendant's use of the same shape had no tendency to show bad faith). As the court explained in U.S. Shoe Corp. v. Brown Group, Inc., 740 F. Supp. 196, 199 n.3 (S.D.N.Y. 1990), aff'd, 923 F.2d 844 (2d Cir. 1990):

> Plaintiff argues that the defendant's bad faith should prevent it from enjoying the benefits of the fair use defense. However, I find that plaintiff has not demonstrated that defendant acted in bad faith. While it is clear that defendant designed its marketing strategy in full knowledge of plaintiff's ad campaign, and with appreciation of the success of plaintiff's sneaker metaphor . . . that is not necessarily evidence that defendant acted with the specific intent to misappropriate plaintiff's good will. Where two products are essentially similar, and ways to describe their key selling feature limited, some overlap in language used to describe them is almost inevitable. The fact that one manufacturer used the descriptive language first, and the other one knew about it, does not demonstrate that the second user chose overlapping language in bad faith.

For all of these reasons, Defendants' use of the phrase "social savvy" is protected by the fair use doctrine. See WCVB-TV, supra (T.V. Channel's use of the words "Boston Marathon" to describe the event was fair use of the words even though they were trademarked).

## POINT IV

## PLAINTIFF'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW

"[S]tate law trademark and unfair competition claims are indistinguishable from [a] Lanham Act claim," and thus should be dismissed for the reasons set forth above. Straumann Co. v. Lifecore Biomedical, Inc., 278 F. Supp. 2d 130, 140 (D.Mass. 2003).

A.  Unfair Competition

In order to recover for an unfair competition claim, a plaintiff must show either: 1) "palming off", as defined as an attempt by the defendant to "deceive the public into believing it is trading with one person when in fact it is dealing with another", or 2) that the features of the product have acquired a secondary meaning such that confusion as to its source is likely to arise through the defendant's use. Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 768-69 (Mass. 1986); Pic Design Corp. v. Bearings Specialty Co., 436 F.2d 804, 807 (1st Cir. 1971). "Under either theory, it is evident that the gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services." Datacomm, 396 Mass. at 769. As set forth above, Plaintiff cannot establish an intent to deceive, secondary meaning or a likelihood of confusion. Thus, Plaintiff cannot establish a claim of unfair competition under the common law.

B.  Trademark Dilution Claim Under Massachusetts G.L. C. 110b § 12

In order to obtain relief under the anti-dilution statute, a plaintiff must show that "his mark is distinctive and there is a likelihood of dilution due to (1) injury to the value of the mark caused by actual or potential confusion, (2) diminution in the uniqueness and individuality of the mark, or (3) injury resulting from use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with plaintiff's mark." L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 30 (1st Cir. 1987); Astra, 718 F.2d at 1209.

For the reasons previously stated, Plaintiff's "mark" is not distinctive, but rather a generic compound phrase that merely describes the basic nature of the services Plaintiff offers. Even

assuming *arguendo* that Plaintiff's "mark" is distinctive, she is unable to demonstrate any of the factors that would lead to a conclusion that there is a likelihood of dilution because of Defendant's use. First, as discussed above, Plaintiff has failed to show any actual or potential confusion between Defendants' use of the phrase "Social Savvy" and Plaintiff's "mark." Second, because of the extensive third party use of the phrase "Social Savvy," Plaintiff cannot show there has been a diminution in the uniqueness and individuality of her "mark" because of Defendants' use. Astra, 718 F.2d. at 1210 (affirming the district court's grant of summary judgment on the trademark dilution claim where there had been extensive third-party use of the word "ASTRA" stating "If the other registrations and uses of the 'ASTRA' mark have not already diminished the uniqueness of Astra's mark, Beckman's use of it on its analyzer will not diminish it, either.").

Third, Plaintiff can proffer no evidence that by using the phrase "Social Savvy" as part of the title for the Girl's/ Guy's Guides, Defendants have tarnished or appropriated any alleged goodwill and reputation associated with Plaintiff's "mark," let alone any resulting injury. See Ré Dep. at 109, 154.

C.  Unfair Trade Practices Claim Under Massachusetts G.L. C. 93A

The elements of a claim under the Massachusetts Consumer Protection Act, Mass.Gen.Laws ch. 93A, §§ 2, 11, for the most part, mirror the elements of a claim for trademark infringement under the Lanham Act. Gillette Co. v. Norelco Consumer Products Co., 946 F. Supp. 115, 120, n.3 (D. Mass. 1996). A Chapter 93A claim requires a plaintiff to demonstrate an additional element that the defendant knew or should have known that a statement it has made is false or misleading. Id.[11] Thus, just like a Lanham Act claim, an

---

[11] Court's applying Chapter 93A have established that a claimant must show "objectionable conduct [that] must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world

essential element of an action under Chapter 93A is that the defendant's use of a mark caused confusion among customers as to the source of the plaintiff's product. R.J. Toomey Co. v. Toomey, 683 F. Supp. 873, 879 (D.Mass. 1988). Since, as set forth above, Plaintiff cannot prove any element of her Lanham Act claim, including customer confusion, her Chapter 93A claim must be dismissed.

## CONCLUSION

For all of the foregoing reasons, the motion of defendants Jodi R. R. Smith and Barnes & Noble, Inc. for summary judgment should be allowed.

Dated: November 24, 2004

DEFENDANTS JODI R. R. SMITH and
BARNES & NOBLE, INC.

By their attorneys,

*/s/*

Richard S. Sanders (BBO # 562014)
Jeffery Francis (BBO# 639944)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts 02109
(617) 338-2800

Erik W. Kahn
Daniel P. Waxman
Kira P. Watson
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by email/by hand.

Date: 11-24-04

---

of commerce." Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001). "Ordinary negligence alone, which does not 'reek of callousness' or 'meretriciousness,' is not the sort of 'truly inequitable marketplace behavior' which Chapter 93A was intended to punish." American Tel. & Tel. Co. v. IMR Capital Corp., 888 F. Supp. 221, 256 ( D. Mass. 1995) (citations omitted). Since Defendants in good faith used the generic phrase "Social Savvy" to describe the contents of the Girl's/Guy's Guides, Defendants have not come close to approaching the type of commercial rascality Chapter 93A was enacted to punish.

30