UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**F I L E D**
Clerk's Office
USDC, Mass.
Date _12·13·04_

By _____
Deputy Clerk

| | |
|---|---|
| JUDITH RÉ,<br><br>               Plaintiff,<br><br>      v.<br><br>JODI R.R. SMITH, and<br>BARNES & NOBLE, INC.<br>             Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil No. 04-11385-RGS |

## JUDITH RÉ'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The fundamental premise of defendants' motion for summary judgment is that Judith Ré's registered trademark, SOCIAL SAVVY®, deserves no legal protection whatsoever. Notwithstanding her continuous use of the mark for more than 18 years to brand the goodwill of Ms. Ré's etiquette consulting business, defendants elected with full knowledge of Ms. Ré's trademark to ignore it and use their substantial resources to run roughshod over Ms. Ré and to take for themselves her mark and its concomitant goodwill. They do so arguing that the mark is generic, yet they gratuitously feature "SOCIAL SAVVY®" as the predominant words of their book titles to capitalize on the phrase, but never again use the phrase in the chapters in their books. Moreover, defendants admit that they have contemplated a series of etiquette books using the phrase "SOCIAL SAVVY®" as the trademark term for this series. Their arguments, asserted as they are upon summary judgment, must rest upon a claim that there are no genuine issues of material fact with respect to genericness, secondary meaning, confusion or defendants' bad faith. Finally, defendants all but ignore Ms. Ré's state law rights protecting her from dilution of her mark and unfair competition.

This opposition will demonstrate that Ms. Ré is entitled to a trial to determine whether defendants' conduct is legally acceptable.

## I.    FACTUAL BACKGROUND

### A.    Ms. Ré's Registration Of The SOCIAL SAVVY® Mark For Etiquette Instruction

In 1990, Ms. Ré sought to register the mark SOCIAL SAVVY® with the United States Patent and Trademark Office ("USPTO") in order to protect her rights in her SOCIAL SAVVY® brand of etiquette consulting. Exhibit A to the Affidavit of Daniel A. Curto ( "Curto Aff."). After the USPTO reviewed and published SOCIAL SAVVY® for opposition, it approved the registration in December 1991. A copy of Ms. Ré's mark, Registration No. 1,669,778, is attached as Curto Aff., Exh. A. In January 1997, Ms. Ré filed an affidavit pursuant to sections 8 and 15 of the Lanham Act attesting that she continually used her SOCIAL SAVVY® mark since registration. Curto Aff., Exh. B. Pursuant to 15 U.S.C. §1065, this affidavit made Ms. Ré's SOCIAL SAVVY® mark incontestable. Ms. Ré renewed her mark with the United States Patent and Trademark Office in 2001. See Curto Aff., Exh. A.

### B.    Ms. Ré's SOCIAL SAVVY® Etiquette Programs

Ms. Ré started her etiquette consulting business in 1986. Deposition of Judith Ré Morgan ("Ré Depo.") p. 15, attached to Curto Aff. as Exh. T. Shortly after starting her business she reached an agreement with the Ritz-Carlton Hotel in Boston to regularly provide SOCIAL SAVVY® etiquette classes to teenagers at the hotel. Ré Depo. p. 24. Since that time, Ms. Ré has developed relationships with numerous other luxury hotels, corporations and individuals across the United States to provide her SOCIAL SAVVY® brand of etiquette instruction. Ré Depo. p. 33. These clients include a former United States diplomat to the Vatican, the Four Seasons Hotels & Resorts in Chicago, Seattle and San Francisco, the Century Plaza Hotel in Los Angeles,

- 2 -

the Palace Hotel in New York, the Ritz-Carltons in Boston, New York, Cleveland and

Washington D.C., Hilton Hotel in Short Hills, N.J. and the Hyatt in Greenwich, CT, and

businesses and groups like Astra Pharmaceuticals, Liberty Mutual, Harcourt General and the

Japanese Travel Bureau.  Affidavit of Judith Ré ("Ré Aff."), ¶ 4.

   Ms. Ré's most well-known etiquette seminar is "A Day of SOCIAL SAVVY®" at the

Ritz-Carlton in Boston.  Ré Depo. p. 24.  The seminar is aimed at teaching social graces to

teenagers and young adults.  Ré Depo. p. 24.  She also teaches a similar class under the SOCIAL

SAVVY® name at the Ritz-Carlton, Battery Park in New York.  Ré Depo. p. 73.  In addition, Ms.

Ré regularly conducts business and wedding etiquette classes for adults, including the classes

"SOCIAL SAVVY® for Business" and "SOCIAL SAVVY® Weddings."  Ré Depo. p. 122.  Ms.

Ré uses her SOCIAL SAVVY® brand name with all of her etiquette instruction work.  Ré Depo.

p. 45.

   Submitted herewith are the affidavits of Carol LeBrun ("LeBrun Aff.") and Anita Cotter

("Cotter Aff.").  Ms. LeBrun is the Area Director of Public Relations for the Ritz-Carlton hotels

in Boston.  LeBrun Aff. ¶ 2.  Ms. Cotter is the former Director of Public Relations at the Palace

Hotel in New York and the Ritz-Carlton, New York on Central Park South.  Cotter Aff. ¶ 2.  As

set forth in these affidavits, Ms. LeBrun and Ms. Cotter have worked with Ms. Ré on behalf of

various luxury hotels for numerous years.  LeBrun Aff. ¶ 1; Cotter Affi. ¶ 1.  The hotels that Ms.

LeBrun and Ms. Cotter worked for hired Ms. Ré to present her SOCIAL SAVVY® brand

etiquette instruction to hotel guests.  LeBrun Aff. ¶¶ 3-4; Cotter Aff. ¶¶ 2-3.  Both are familiar

with the registration process for Ms. Ré's classes and know that registrants often ask for these

classes by their "SOCIAL SAVVY®" name.  LeBrun Aff. ¶ 6; Cotter Aff. ¶ 4.  Ms. Ré's

registrants, in fact, often ask to take classes with the "SOCIAL SAVVY® woman."  Id.

BST99 1438024-1.071236.0011

Ms. LeBrun and Ms. Cotter, as public relations directors at luxury hotels, are familiar with many etiquette instructors. LeBrun Aff. ¶ 7; Cotter Aff. ¶ 6. Ms. LeBrun and Ms. Cotter are unfamiliar with any of these instructors using SOCIAL SAVVY® to describe their etiquette instruction, their product or etiquette generally. Id. In the etiquette instruction industry, SOCIAL SAVVY® means Ms. Ré. Id.

### C.    Ms. Ré's Book: SOCIAL SAVVY®

Ms. Ré is also the author of a book, SOCIAL SAVVY®. Curto Aff., Exh. I. Ms. Ré's SOCIAL SAVVY® book is an etiquette instruction book aimed primarily – although not exclusively – at teenagers. Ré Depo. p. 52. The copyright page of her book clearly states that "SOCIAL SAVVY® is a registered service mark of Judith Ré." Curto Aff., Exh. O.

Simon & Schuster first published Ms. Ré's book in 1991 and printed it 11 times over the course of 13 years. Ré Depo. p. 64. In March 2004, Simon & Schuster decided not to reprint the book. Id. Although the book is not being reprinted it is still sold in stores. In the last year, Barnes & Noble, Inc. ("B&N") sold 136 copies of Ms. Ré's SOCIAL SAVVY®. See BN02227-BN02228, Curto Aff., Exh. D. In May 2004 — one month after defendants' books were released — B&N sold 8 copies of Ms. Ré's SOCIAL SAVVY® book. See BN01340, Curto Aff., Exh. E; Einhorn Depo. p. 131.

Carole Lalli, a former editor at Simon & Schuster who worked with Ms. Ré on the publishing of SOCIAL SAVVY®, attests that Simon & Schuster published Ms. Ré's book in part because of the national media that her SOCIAL SAVVY® programs had garnered. Affidavit of Carole Lalli ("Lalli Aff.") ¶ 4. Ms. Lalli, who has an extensive background in the publishing industry, states that Ms. Ré's book was highly successful. Lalli Aff. ¶ 8.

- 4 -

When Ms. Lalli worked at Simon & Schuster and Rizzoli International, another book publisher, it was both companies' normal course of operation to run title and trademark searches before publishing a book. Lalli Aff. ¶ 5. Thus, Ms. Lalli would have looked into whether Ms. Ré's proposed title was identical or similar to any other books on the market. Id. She would run this search in order to avoid printing a book with a title that was identical or similar to another book on the market. Id. She did this because books with identical or similar titles cause confusion about the association of the books. Id. On several occasions Ms. Lalli recalled changing the title of a book because it was identical or similar to another book on the market. Id. Ms. Lalli's understanding is that when Simon & Schuster published Ms. Ré's book there were no other books on the market — etiquette or otherwise — that used the term SOCIAL SAVVY® in the title. Id.

Although Simon & Schuster normally looked into any possible trademark infringement issues, they did not because Ms. Ré had already obtained a trademark for the term SOCIAL SAVVY®®. Lalli Aff. ¶ 6. Often times, however, the publishing companies Ms. Lalli worked for would scan the records of the USPTO to ensure no trademark issues would arise with a potential title. Id.

### D. Ms. Ré's Has Received Significant National Media Exposure and Promotion Because of Her SOCIAL SAVVY® Etiquette Programs and Her Book

Ms. Ré's SOCIAL SAVVY® etiquette programs and SOCIAL SAVVY® book have garnered significant national media recognition. Ré Aff., Exh. A. Articles on Ms. Ré and her SOCIAL SAVVY® etiquette programs have appeared in the New York Times, Wall Street Journal, Washington Post, Los Angeles Times, London Daily Mail, USA Today, Parade Magazine, Yankee Magazine, Forbes Magazine, The Robb Report, Seventeen, Parenting, Working Mother, Child Magazine, The Christian Science Monitor, The Boston Herald and The

Boston Globe. Id. Within the last two months alone, Ms. Ré and Her SOCIAL SAVVY® brand

of etiquette instruction have been mentioned in Newsweek, The Connecticut Post, The New

York Observer and on NBC Nightly News. Id. In addition, Ms. Ré has been interviewed about

her SOCIAL SAVVY® brand of etiquette instruction on CNN, The Today Show, Good Morning

America, American Journal, The Joan Rivers Show, The Montel Williams Show, The View, The

Travel Channel, BBC and BBC Radio. Ré Aff. ¶ 3.

Defendants' motion attempts to attribute significance to the fact that Ms. Ré does not

advertise her SOCIAL SAVVY® etiquette services.[1] Ms. Ré, however, does not have to

advertise. The significant media exposure that Ms. Ré receives is better advertising than any she

could pay for. Ré Aff. ¶ 3 and Exh. A. Furthermore, although Ms. Ré does not run paid

advertisements, the corporate customers who hire her often advertise her services. The Boston

Ritz-Carlton Hotel, for instance, mails a description of Ms. Ré's SOCIAL SAVVY® etiquette

program to its guests and persons on its mailing list at least four times a year. LeBrun Aff. ¶ 4;

see Curto Aff., Exh. W. Ms. Ré's SOCIAL SAVVY® etiquette programs have twice won

national awards from the Hotel Sales & Marketing Association. Cotter Aff. ¶ 3.

### E.    Defendants Purposefully Misappropriated Ms. Ré's SOCIAL SAVVY® Brand To Sell Their Etiquette Instruction Books

#### 1.    Defendants Were Aware Of Ms. Ré's SOCIAL SAVVY® Mark Before Publishing Their Books.

In April 2004, defendants began selling two etiquette instruction books that contained

Ms. Ré's SOCIAL SAVVY® branding in the title – "The Girl's Guide to Social Savvy" and "The

Guy's Guide to Social Savvy" (collectively the "Social Savvy guides"). Deposition of Hallie

Einhorn ("Einhorn Depo.") p. 109, attached to Curto Aff. as Exh. V. Defendants first decided to

---

[1] Ms. Smith admitted in her deposition that she also does not market her business or "do any paid advertising." Smith Depo. p. 27.

write these books in late February 2003. Einhorn Depo. p. 39. B&N decided to title these books using Ms. Ré's SOCIAL SAVVY® mark in the titles in March 2003. Einhorn Depo. p. 59. Later that month, B&N chose Jodi R.R. Smith as the author. Einhorn Depo. p. 79.

B&N claims that it did not run a title or trademark search any time before publication of the books. Einhorn Depo. p. 92. B&N admits, however, that books with the same titles can, at a minimum, cause consumer confusion. Id.

Despite not running title or trademark searches, there is abundant evidence that defendants were aware of Ms. Ré's SOCIAL SAVVY® mark before they published the Social Savvy guides. This evidence includes:

- Years before B&N published, marketed and sold the Social Savvy guides it sold and promoted Ms. Ré's SOCIAL SAVVY® book . B&N even hosted book signings by Ms. Ré. Ré Depo. pp. 58-59.

- The editor of the Social Savvy guides, Hallie Einhorn, titled the books after researching a list of B&N's 25 top selling etiquette books, which included Ms. Ré's book SOCIAL SAVVY®. Einhorn Depo. p. 46-47.

- Ms. Smith had read parts of Ms. Ré's book in 1998 or 1999. Deposition of Jodi R.R. Smith ("Smith Depo.") (attached at Curto Aff., Exh. U) p. 44. Smith thought so highly of Ms. Ré's SOCIAL SAVVY® book that she had listed it as a recommended title on her website.[2] Smith Depo p. 45; and Curto Aff., Exh. P.

- Ms. Einhorn admits that she saw a copy of Ms. Ré's SOCIAL SAVVY® book before B&N published the Social Savvy guides. Einhorn Depo. pp. 67-68. She saw it while browsing through etiquette books at a B&N store. Id. She remembers noticing that Ms. Ré's book had the words SOCIAL SAVVY® in its title just like the titles she gave the Social Savvy guides. Einhorn Depo. p. 68. Ms. Einhorn claims she did no further follow-up regarding Ms. Ré's SOCIAL SAVVY® book. Einhorn Depo. p. 71.

- Ms Smith acknowledges that she knew about Ms. Ré's "A Day of SOCIAL SAVVY®" etiquette seminars at the Boston Ritz-Carlton Hotel at least 4 to 6 months before her books were published and sold by B&N. Smith depo. pp. 49-50.

---

[2] Smith now claims that she only skimmed portions of Ms. Ré's book. Defendants Memo. p. 21. Such a claim strains creditability given Ms. Smith's recommendation of the book on her website.

BST99 1438024-1.071236.0011

- Four months before B&N published and started selling the Social Savvy guides, Ms. Smith e-mailed Ms. Einhorn to inform her about Ms. Ré's SOCIAL SAVVY® book. Smith Depo. p. 68-69. In the e-mail she asked if they should be concerned about using SOCIAL SAVVY® in the title of their books because "obviously, the big words in the title [of Ms. Ré's book] are SOCIAL SAVVY®." Smith Depo. p. 68-69. See also Curto Aff., Exh. H. Ms. Smith e-mailed Ms. Einhorn because she had legal concerns about using the title SOCIAL SAVVY® in her book. Smith Depo. p. 77.

- Despite Ms. Smith's concern, B&N did nothing to ensure it did not violate Ms. Ré's trademark for SOCIAL SAVVY® brand etiquette instruction. Ms. Einhorn's only response was to have a short conversation with her senior editor about using the phrase SOCIAL SAVVY®. Einhorn Depo. p. 64. Einhorn did no further follow-up. Einhorn Depo. p. 69-71. She did not seek advice from B&N's legal department or ask anyone to run a trademark search for SOCIAL SAVVY®. Einhorn Depo. p. 71-72.

  2.  *Defendants Intended To Use SOCIAL SAVVY® As A Trademark.*

The term SOCIAL SAVVY® is the focal point of Defendants' books. It appears in a different color — shiny silver on the Guy's Guide and shiny gold on the Girl's Guide — a different font, and in the middle of the books' covers. Curto Aff., Exh. I. Prior to this litigation the Defendants referred to the books as the "Social Savvy" guides. Smith Depo. p. 60.

Although the term SOCIAL SAVVY® is a prominent identifier in the title, the phrase social savvy doesn't appear anywhere in the books other than a few times in their introduction. See Curto Aff., ¶ 11. Not a single chapter includes the phrase social savvy. Id. On the other hand, the word "etiquette" appears 24 times in the Girl's Guide; and 22 in the Guy's Guide; "manners" 14 times in the Girl's Guide and 16 in the Guy's Guide, and "charm" 5 times in the Girl's Guide. Id. [3].

Moreover, B&N intended to use SOCIAL SAVVY® as the trademark identifier for a series of etiquette books it contemplated. Einhorn Depo. p. 60. Ms. Einhorn, in fact, created a

---

[3] In fact, plaintiffs have searched the text of 15 of the most popular etiquette books, including some by Peggy Post, Elizabeth Post and Judith Martin, and not a single one uses the phrase social savvy. See Curto Aff., ¶ 13.

list of potential etiquette titles that included "Social Savvy Guide to Business," "Social Savvy Guide to Toasts," "Social Savvy Guide to Weddings" and "Social Savvy Guide to Entertaining." Einhorn Depo. p. 60.  BN00019; Curto Aff., Exh. Q.  B&N was going to relate all of these etiquette instruction books by using the phrase SOCIAL SAVVY® in the titles of the series. Einhorn Depo. p. 61.

Since B&N published Ms. Smith's books, Ms. Smith has promoted some of her seminar and radio appearances using the name SOCIAL SAVVY®.  Curto Aff., Exh. C.  On May 6, 2004, for instances, she presented a seminar titled "SOCIAL SAVVY®:  Manners for the Modern World" at the Lenox Hotel in Boston.  Curto Aff., Exh. R.

> 3.    *After This Lawsuit Commenced Defendants Have Done Nothing To Disassociate Their Social Savvy guides With Ms. Ré's SOCIAL SAVVY® Brand Of Etiquette Instruction.*

Ms. Ré sent a cease and desist letter to defendants on May 7, 2004. Curto Aff., Exh. S. Despite receiving this letter, defendants continued to engage in an extensive media tour to promote their books.  The tour consisted of at least 19 radio appearances, at least 3 book signings by Ms. Smith, and the mailing of 60 promotional letters to major media outlets.  Smith Depo. pp. 29-30; Curto Aff., Exh. C.  B&N and Ms. Smith did nothing at any of these promotional appearances to relieve any possible confusion.  B&N did not tell Ms. Smith to disclaim any affiliation with Ms. Ré or her SOCIAL SAVVY® brand of etiquette instruction.  Einhorn Depo. p. 166.  Likewise, Smith did not disclaim any affiliation with Ms. Ré or her SOCIAL SAVVY® brand.  Smith Depo pp. 131, 140-141.

In June 2004, B&N contemplated changing the titles of the Social Savvy guides.  Einhorn Depo. p. 174.  Ultimately, however, B&N did not change the title of the books because they did not want to miss capitalizing on the publicity for the books. Einhorn Depo. pp. 174, 178.

BST99 1438024-1.071236.0011

### F.     Defendants Have Caused Confusion In The Marketplace

At four separate B&N stores, sales clerks have referred Ms. Ré, her mother, her daughter and Kimberly Farrell to Defendants' Social Savvy guides when they asked for a book by a person who used the book title SOCIAL SAVVY®. Ré Depo. pp. 103-104; Affidavit of Kim Farrell ("Farrell Aff.") ¶ 3. In all instances, the person who asked the sales clerk for the information asked for a book that had SOCIAL SAVVY® in the title. Id. In Ms. Farrell's case, after the clerk referred her to the Defendants' Social Savvy guides, Ms. Farrell asked her if there could be any other book by another author. Id. The clerk told her there were no other books. Id.[4]

### II.     DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT

In order to obtain summary judgment the moving party must establish that there is "no genuine issue of material fact and that [it is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The district court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) The moving party's evidence must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. First Nat'l Bank v. Cities Service Co., 391 U.S. 253 (1968). In trademark cases, summary judgment is often inappropriate because the facts are generally complicated and require substantial development. Farkas v. Mobil Oil Corp., 1985 U.S. Dist. LEXIS 12221, at *5 (D. Mass. Dec. 30, 1985). Here, the defendants cannot meet their burden.

---

[4] Ms. Farrell also visited another Barnes & Noble bookstore in Bellingham, Massachusetts and asked the clerk there for a book under the title "SOCIAL SAVVY." Farrell Aff. ¶ 4. There, the clerk referred Ms. Farrell to Ms. Ré's book SOCIAL SAVVY. Id. When Ms. Farrell asked the B&N clerk if Ms. Ré was the person who taught the SOCIAL SAVVY etiquette classes, the clerk told her she thought Ms. Ré was that person. Id.

BST99 1438024-1.071236.0011

**A.    Ms. Ré's Incontestable Mark Is Protectable Under the Lanham Act**

This Court must start its analysis of Ms. Ré's mark with the presumption that because it

is registered it is valid. <u>Equine Technologies v. Equitechnology</u>, 68 F.3d 542, 544 (1st Cir.

1995) (registered marks are presumed valid); <u>Half Price Books, Records, Magazines, Inc. v.</u>

<u>Barnesandnoble.com, LLC.</u>, 2004 U.S. Dist. LEXIS 23691, at *25 (N.D. Tex. Nov. 22, 2004).

Moreover, because Ms. Ré's mark is now incontestable her registration is *conclusive evidence* of

the validity of the registered mark. 15 U.S.C. § 1115(b) (emphasis added); <u>Park 'N Fly, Inc. v.</u>

<u>Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 196 (1985) (finding that presumption of validity created

by registration is rebuttable *until* right to use the mark becomes incontestable). It is well-settled

that defendants cannot attack the validity of an incontestable mark by arguing it is descriptive

without secondary meaning. <u>See</u> <u>e.g.</u>, <u>Park 'N Fly</u>, 469 U.S. at 193.

Defendants disregard the well-settled law by asserting the flawed argument that Ms. Ré's

registration for "training programs and educational classes in teaching young people the social

graces" does not cover books. This argument is simply misguided. First, a natural reading of

Ms. Ré's registration is that it covers books in that they are part of her training programs and

teaching in the social graces. Moreover, Ms. Ré's trademark protection is not limited to the

precise description of services and goods in her registration. Ms. Ré's legal rights in the

SOCIAL SAVVY® brand extend to any product which the public would assume originates with

her. <u>Continental Motors Corp. v. Continental Aviation Corp.</u>, 375 F.2d 857, 861 (5th Cir. 1967)

(reversing dismissal of infringement claim and noting "[t]he remedies of the owner of a

registered trademark are not limited to the goods specified in the certificate, but extend to any

goods on which the use of an infringing mark is *likely* to cause confusion"; <u>Foxfire Fund, Inc. v.</u>

<u>Burke</u>, 1978 U.S. Dist. LEXIS 14461, at *13-*14 (N.D. Ga. Nov. 8, 1978) (granting preliminary

injunction to magazine publisher of home products against builder of homes because the

- 11 -

trademark remedies of an owner of a registered trademark extend to any goods on which the use of an infringing mark is likely to cause confusion or to deceive purchasers as to the source of origin.) Here, there can be no question that Ms. Ré's registration of SOCIAL SAVVY® for etiquette instruction would encompass etiquette instruction books that use her SOCIAL SAVVY® mark.

### 1.    SOCIAL SAVVY® Is Not Generic.

The question of whether a term is generic is one of fact: do consumers associate the term with the product rather than the brand of a product? Public Serv. Co. v. Nexus Energy Software, Inc., 36 F. Supp. 2d 436, 438 (D. Mass. 1999). Because registered marks are presumed valid, genericness can only be decided on summary judgment if the evidence is so one-sided that there can be no doubt about how the question can be answered. Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 301 (7th Cir. 1998), *overruled in part on other grounds*, 532 U.S. 23, 28 (2001); Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc., 871 F.2d 590, 593 (6th Cir. 1989) (defendant must show by a preponderance of the evidence that mark is generic).

"A mark is 'generic' only when it has become the name of a product (e.g., 'sandwich' for meat between slices of bread) or a class of products (thus 'church' is generic)." Thomas & Betts, 138 F.3d at 300. Moreover, "[T]hird-party uses in unrelated markets have limited relevance." American Olean Tile Co. v. American Marazzi Tile, Inc., 1988 U.S. Dist. LEXIS 11103, at *11 (E.D. Pa. Oct. 4, 1988) (citing, *inter alia*, 1 McCarthy § 11:26(B) at 513). Rather, the critical inquiry is how consumers seeking etiquette instruction view the mark. Thus, in Tree Tavern Prods., Inc. v. ConAgra, Inc., the court rejected defendants claim that the term "side dish" was generic for frozen food dishes. 640 F. Supp. 1263, 1267 (D. Del. 1986). The court acknowledged that side dish was generic for some uses. Id. But it was not generic for frozen food products because no one goes to the "side dish" section of the supermarket. Id.

- 12 -

Similarly, Ms. Ré's SOCIAL SAVVY® brand of etiquette instruction is not generic. Defendants have not presented any evidence that consumers of etiquette instruction associate SOCIAL SAVVY® with a genus of etiquette instruction of which there are more specific species. Rather SOCIAL SAVVY® is Ms. Ré's distinctive brand of etiquette instruction services. Thus, Ms. Cotter and Ms. LeBrun – both of whom are consumers of etiquette instruction seminars for their employers – attest that in the etiquette instruction market SOCIAL SAVVY® is Ms. Ré. Cotter Aff. ¶ 6; LeBrun Aff. ¶ 7. Neither Ms. Cotter nor Ms. LeBrun know of any other etiquette instructor that uses SOCIAL SAVVY® to describe their work. Id.

> a. Defendants' Compilation Of Usage Does Not Show That Ms. Ré's SOCIAL SAVVY® mark is Generic.

In support of their motion, defendants offer the affidavit of Todd S. Braverman, which consists of a compilation of information that Mr. Braverman has collected from all over the world where persons have used the term social savvy in any context. This type of evidence does not show genericness. For instance, in Nexus Energy, as in this case, defendants offered examples that plaintiff's mark, "Energy Place", was used in everyday language, including "numerous exhibits" showing that many power companies had mailing addresses that included the term "Energy Place" and listing a number of corporations that used "Energy Place" in their name. 36 F. Supp. 2d. at 438. The court rejected defendants' argument that this evidence sufficiently proved "Energy Place" was generic. Id. According to the Court, what was significant was the trademark context used by the plaintiff and the defendants examples did not amount to a showing that the term "Energy Place" was a generic term used for websites where consumers can find information regarding energy products and services. See also Half Price

- 13 -

Books, 2004 U.S. Dist. LEXIS 23691, at *27-31 (rejecting BN.Com's claim that plaintiff's mark was generic because BN.Com provided the court evidence of "extensive third-party use").[5]

As in Nexus Energy and Half Price Books, Defendants' compilation here also does not show that SOCIAL SAVVY® is generic for etiquette instruction. In fact, if anything, Mr. Braverman's affidavit shows only that persons — not consumers of etiquette instruction — use the phrase social savvy to mean any number of things. This alleged proof, rather than showing that Ms. Ré's mark is generic, in fact supports Ms. Ré's contention that her mark is suggestive. See Equine Technologies, 68 F.3d at 545 (mark is suggestive when it needs context to understand its meaning and the nature of the goods and services it covers). With all of the various uses described in the Braverman Affidavit one cannot credibly claim that "social savvy" is a generic term meaning etiquette instruction. In fact, the plaintiff has searched over 980 dictionaries for the term "social savvy" and it does not appear in a single one. See Curto Aff., ¶ 14 and Exh. N.

Moreover, Braverman's compilation of internet and news searches is, at best, misleading in that it implies that its examples refer directly to etiquette when in fact most do not. The compilation disregards the relevant industry, geographic boundaries, context and form of the usage of social savvy. For instance[6]:

---

[5] The Natron case upon which defendants rely makes clear that the Court granted summary judgment there because the defendants were able to show through "overwhelming evidence" — including deposition testimony of third party participants in the field and evidence that the USPTO now considered the mark generic — that the plaintiff's mark was now generally associated with the product genus and not the plaintiff's product. 305 F.3d at 406
[6] It is impossible to accurately assess the veracity of Mr. Braverman's affidavit since he fails to provide documentation for many of his references and the documentation he does provide often contains only truncated snippets of references.

BST99 1438024-1.071236.0011

- 41 of the examples relate to psychology, sociology or self-awareness[7], 39 of the examples pertain to business management[8], 6 relate to a personality trait[9] and 1 relates to a manner of dressing[10].

- 58 of the examples do not even use the noun social savvy. Rather, these examples use the adjectives "Socially Savvy" or "Savvy Social."[11]

- Some of the examples are from outside the United States. Thus, the book Social Savvy – Help Your Child Fit in With Others, which relates not to etiquette or social graces but how to raise psychologically stable children, is published in Australia and can be purchased only with Australian dollars. Similarly, at least 17 other examples are from publications outside the United States.[12]

- At least one of the examples actually refers to Ms. Ré's SOCIAL SAVVY® brand of etiquette products. See example 72.

Finally, defendants put a sub-title on their books to address the very issue that the words SOCIAL SAVVY® do not generically convey etiquette or manners. Indeed, Michael Fragnito, a B&N publisher, told B&N's editors that the books needed a sub-title that included the words "manners" or "etiquette" in order to clarify their purpose. Einhorn Depo. p. 109.

2.    *SOCIAL SAVVY® Is Not A Descriptive Mark And Even If It Were It Has Obtained Secondary Meaning.*

SOCIAL SAVVY® is a suggestive mark because it requires imagination, thought and perception to reach a conclusion as to the nature of the goods Ms. Ré is selling. See 2 J. McCarthy on Trademarks, §11:2 at 11-5, and 11:67 at 11-129 (noting that "marks are characterized as arbitrary, fanciful, suggestive or descriptive. A mark is suggestive, and thus

---

[7] See examples 39, 40, 44, 47, 65, 87, 91, 92, 93, 99, 100, 107, 116, 121, 126, 131, 141, 152, 154, 155, 165, 189, 193, 194, 195, 196, 197, 216, 219, 220, 222, 224, 240, 241, 245, 248, 249, 255, 262, 295, 300, and 306.

[8] See examples 38, 45, 89, 90, 94, 96, 102, 105, 111, 118, 121, 132, 137, 146, 151, 161, 166, 167, 181, 185, 198, 200, 215, 230, 246, 260, 263, 273, 292, 299, and 302.

[9] See examples 238, 257, 275, 278, 284, and 297.

[10] See example 43.

[11] See examples 49, 66, 78, 82, 83, 86, 192, 193, 195, 196, 198, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 213, 214, 217, 219, 220, 221, 222, 226, 229, 231, 233, 237, 238, 239, 240, 242, 243, 244, 245, 246, 248, 249, 263, 265, 269, 270, 272, 277, 278, 279, 280, 284, 293, 294, and 297.

[12] See examples 65, 82, 87, 180, 192, 204, 206, 211, 216, 221, 222, 229, 236, 237, 255, 257, 295 and 303.

BST99 1438024-1.071236.0011

inherently distinctive, if the mental leap between the word and the product's attributes is not almost instantaneous"). Thus, while the public may know that the term "savvy" means know-how, when the term is modified by "social", it could have a wide variety of meanings such that the public must surmise which of the various meanings might apply. Defendants' Braverman Affidavit highlights the many potential meanings of SOCIAL SAVVY®. The affidavit contains numerous excerpts that equate "social savvy" with such widely varying concepts as: social development (entry 65), intelligence (entry 100), dog behavior (entry 101), dolphin telepathy (entry 116), social conscience (entry 117); networking (entry 118); being hip (entry 128); characteristic of primates (entry 141); sexual awareness (entry 147); charm (entry 150); and even mind reading (entry 138).

Thus, SOCIAL SAVVY® is similar to a mark like "Equine Technologies." In Equine Technologies, the First Circuit held that although consumers might reasonably think that the mark Equine Technologies has to do with horses, the mark is suggestive because it clearly requires the consumer to exercise imagination in order to draw a conclusion as to the nature of the goods and services. 68 F.3d at 545 (internal quotations omitted). Similarly, SOCIAL SAVVY® is not merely a substitute for etiquette instruction, but rather is a more complex, suggestive mark, that requires a context to understand its meaning and the nature of the goods and services it covers. See also CCBN.com, Inc. v. C-call.com, Inc., 73 F. Supp. 2d 106, 115 (D. Mass. 1999) (concluding that "Street Events" is suggestive and protectable because even if one in the industry would intuit that "street" referred to Wall Street, one would also need to intuit that "events" referred "to that part of plaintiff's service which lists earnings events and conference calls").

BST99 1438024-1.071236.0011

Moreover, even if SOCIAL SAVVY® is a distinctive mark, which it is not, Ms. Ré has offered sufficient evidence that her SOCIAL SAVVY® brand of etiquette services has acquired secondary meaning in the etiquette services industry.[13] The affidavits of Carol Lebrun and Anita Cotter explain that Ms. Ré is well-known in the field of etiquette instructions services, that consumers looking for etiquette services often look for Ms. Ré under her SOCIAL SAVVY® brand name and, within the etiquette industry, SOCIAL SAVVY® is Ms. Ré. LeBrun Aff. ¶ 7; Cotter Aff. ¶ 6. This evidence alone creates an issue of fact. See R.J. Toomey & Co. v. Toomey, 683 F. Supp. 873, 878 (D. Mass. 1998) (finding that two affidavits from "long-time members of the clerical apparel industry" that the plaintiff's mark was widely known in the industry and universally associated with plaintiff's business were sufficient evidence of a secondary meaning).

Moreover, Ms. Ré's use of the mark for 18 years further shows its strength. See Alexis Lichine & Cie. v. Sacha A. Lichine Estate Selections, 1985 U.S. Dist. LEXIS 19183, * 7 (D. Mass. June 5, 1985) (Skinner, J.) (finding that "plaintiff's mark is strong, being incontestable and having been in use for more than twenty years"). Ms. Ré's continued use of SOCIAL SAVVY® has garnered her goodwill in the industry. This goodwill is evidenced in the extensive collection of media appearances that Ms. Ré has made over the years. Ré Aff. Exh. A.

In all events, Ms. Ré has offered sufficient evidence of the strength of her mark in the relevant industry, such that summary judgment is not appropriate.

---

[13] Determining whether secondary meaning exists is a highly fact intensive endeavor and is particularly inappropriate at the summary judgment stage. See Travel Magazine, Inc. v. Travel Digest, Inc., 191 F. Supp. 830 (S.D.N.Y. 1961) (denying defendant's motion for summary judgment finding secondary meaning can only be determined at trial);

- 17 -

3.    *Defendants' use of SOCIAL SAVVY® Was Not a "Fair Use".*

Defendants also cannot overcome the conclusive validity and protectability of Ms. Ré's

SOCIAL SAVVY® mark through the "fair use" defense. Defendants could only avail

themselves of the "fair use" defense, if they could show that they did not use SOCIAL SAVVY®

in the trademark sense and used the term fairly and in good faith. See 15 U.S.C. § 1115(b)(4);

see also WCVB-TV v. Boston Athletic Ass'n, 926 F.2d 42, 46 (1st Cir. 1991). Disputed facts

exist as to both of these requirements.

a.    Defendants Used SOCIAL SAVVY® As A Trademark.

A mark is used as a trademark if (1) the term is used to attract public attention, (2) the

term is a prominent element of the package, (3) the phrase is in a different type size or style, (4)

the term is set off, and (5) a subordinate phrase actually describes the product being sold.

Rainforest Cafe, Inc. v. Amazon, Inc., 86 F. Supp. 2d 886, 907 (D. Minn. 1999). See also Tree

Tavern, 640 F. Supp. at 1269 (finding no fair use for term "side dish" because the term is

prominent on defendant's package and product was described by a subordinate phrase). Here,

factual issues exist as to all of these factors.

Defendants use the term SOCIAL SAVVY® prominently to advertise their books. The

eye is immediately drawn to the term on the books because SOCIAL SAVVY® is in a large

cursive, silver or gold font that it is set-off from the rest of the words on the cover, which are all

in a plain white, standard font. See Curto Aff., Exh. I. Even on the spine, the SOCIAL

SAVVY® term is bolded, so that it stands out from the rest of the title. Where, as here, an

infringing term is the most prominent feature of the defendants' product, the defendants have

used the term in a trademark sense. Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d

947, 953-54 (7th Cir. 1992).

Moreover, defendants use of SOCIAL SAVVY® is gratuitous and unnecessary to their content. Other than the title of the books, the term appears only in the books' introduction. Curto Aff. ¶ 11, Exh. J. Defendants do not use the term even once as a substitute for etiquette or manners in any of the books chapters. Thus, like another case involving an affiliate of the defendant, a factual dispute exists here because there is sufficient evidence that a reasonable person could conclude defendants used SOCIAL SAVVY® solely as an attention-getting symbol. See Half Priced Books, 2004 U.S. Dist. LEXIS 23691 at *40-*41 (denying summary judgment to Barnesandnoble.com because they used plaintiff's mark "half priced books" in an attention-getting manner).

In addition, defendants use a subordinate phrase to actually describe their books. Each book is subtitled "Manners For The Modern World" in order to explain their purpose. Einhorn Depo. at 109. See Tree Tavern, 640 F. Supp. at 1269 (finding defendant's use of "side dish" was not merely descriptive or a fair use because product was further described by a subordinate phrase).

Finally, B&N not only used the phrase "SOCIAL SAVVY®" on these books, but in fact contemplated a series of etiquette books using SOCIAL SAVVY® as the trademark phrase in the series. Einhorn Depo. at 60. Thus, Ms. Einhorn named possible titles in the series the "Social Savvy Guide to Business," "Social Savvy Guide to Toasts", "Social Savvy Guide to Weddings" and "Social Savvy Guide to Entertaining." Einhorn Depo. at 60-61. SOCIAL SAVVY® was the "tie in" phrase for all of these etiquette books. Einhorn Depo. at 62.

    b. Defendants' use of the SOCIAL SAVVY® mark was not in good faith.

Defendants also cannot show fair use because material issues of fact exist about defendants' alleged good faith use of SOCIAL SAVVY®. The record contains abundant evidence that defendants were aware of Ms. Ré's SOCIAL SAVVY® work prior to selecting the

- 19 -

title for and publishing the infringing works. This evidence includes:

- B&N selling and promoting Ms. Ré's SOCIAL SAVVY® book for 13 years before it published the Social Savvy guides.

- Hallie Einhorn, the editor of the infringing works, admitted that she selected the titles for the Social Savvy guides only after viewing a list of B&N's top-selling etiquette books, which included Ms. Ré's SOCIAL SAVVY® book.

- Ms. Smith acknowledged that she knew about Ms. Ré's "A Day of SOCIAL SAVVY®" program at the Ritz-Carlton Hotel in Boston at least 4 months before her books were published. In addition, she listed Ms. Ré's SOCIAL SAVVY® book as a recommended title on her website years before publication.

Defendants' prior knowledge, by itself, is enough to raise a material issue about

defendants' bad faith. Thus, in R.J. Toomey, Judge Young found that plaintiff was entitled to a

presumption of bad faith because the defendant knew about the plaintiff's mark but nevertheless

used it. 683 F. Supp. at 877-78.

Moreover, prior knowledge is not the only evidence of bad faith by defendants. B&N's

failure to run a trademark search on the term "SOCIAL SAVVY®" despite their knowledge of

Ms. Ré's mark creates an issue of fact regarding its bad faith. See International Star Class Yacht

Racing Ass'n v. Tommy Hilfiger USA, Inc., 80 F.3d 749, 753 (2d Cir. 1996) (failing to conduct

a trademark search prior to use indicates bad faith). It is inexcusable that B&N, a multi-national

corporation with abundant legal resources, failed to conduct such a search.

In addition, because there are numerous other descriptive terms available for use in

defendants' titles, their use of "SOCIAL SAVVY®" weighs against a finding of good faith. See

Frito-Lay, Inc. v. Bachman Co., 704 F. Supp. 432, 436-37 (S.D.N.Y. 1989). In Frito-Lay, the

court found that because "other potato chip manufacturers use other terms to describe ridged

potato chips, including 'ridged,' 'rippled,' and 'dip style' there are questions about defendants'

asserted good faith." Id. at 437. Finally, an issue about defendants' good faith is raised when

- 20 -

they decided to continue reaping profits by using SOCIAL SAVVY® after Ms. Ré commenced

this infringement action. See International Star Class, 80 F.3d at 753 (defendant reaping profits

while betting on plaintiff's failure to prevail in an infringement actions showed bad faith). In the

instant case, after the lawsuit commenced, defendants engaged in a broad media tour to promote

the books but did nothing to relieve any possible confusion. B&N did not tell Ms. Smith to

disclaim any affiliation with Ms. Ré or her SOCIAL SAVVY® etiquette instruction. Einhorn

Depo. at 166. Likewise, Smith did not disclaim any affiliation with Ré or her SOCIAL

SAVVY® brand. Smith Depo. at 131, 140-141. Moreover, although B&N contemplated

changing the titles of the books it did not because it wanted to capitalize on the publicity it

launched for the books. Einhorn Depo. at 174, 178.

   This additional evidence of bad faith considered in conjunction with Defendants' prior

knowledge, raises, at a minimum, a genuine issue of material fact. See DowBrands, L.P. v.

Helene Curtis, Inc., 863 F. Supp. 963, 970 (D. Minn. 1994) (finding evidence of prior knowledge

sufficient to create a genuine issue of material fact with respect to the issue of good faith and that

"viewing all the evidence in the light most favorable to the plaintiff ... a reasonable factfinder

could infer . . . that [defendant] intended to trade upon the good will" of the plaintiff's mark).

   **B.    Defendants Cannot Obtain Summary Judgment on Likelihood of Confusion**

   In order to obtain summary judgment on either forward or reverse confusion, defendants

must show that there is no genuine issue of material fact as to a likelihood of confusion between

Ms. Ré's SOCIAL SAVVY® brand etiquette instruction and the defendants use of the term

SOCIAL SAVVY® in the title of their etiquette instruction books. The likelihood of confusion

analysis is a question of fact and courts have recognized that it is only in rare instances where the

facts are so black and white that it can be stated unequivocally that there is no genuine issue as to

any material fact and no issues to be resolved at trial. Farkas, 1985 U.S. Dist. LEXIS 12221, at

*6 (citing Coca-Cola Co. v. Snow Crest Beverages, Inc., 162 F.2d 280, 283 (1st Cir. 1947)); see also Lone Star Steakhouse & Saloon v. Alpha of Virginia, 43 F.3d 922, (4th Cir. 1995) (stating that the likelihood of confusion analysis is so hazy and grayish that summary judgment is rarely granted).

Defendants misleadingly focus their likelihood of confusion analysis as a comparison of Ms. Ré's book and the defendants' books. Ms. Ré's trademark rights, however, are broader than her book. They include her SOCIAL SAVVY® brand seminars and other etiquette instruction activities. This Court's analysis must look at the likelihood of confusion between all of Ms. Ré's SOCIAL SAVVY® brand etiquette products and defendants' etiquette instruction books.

This examination raises material issues of fact regarding whether the defendants' Social Savvy guides created either, or both, forward and reverse confusion. Forward confusion exists when a defendant seeks to use a plaintiff's trademark in order to capitalize on the goodwill that plaintiff has established in the market. Digital Equip. Corp. v. AltaVista Tech., 960 F. Supp. 456, 478 (D. Mass. 1997). As set forth, Ms. Ré can present sufficient evidence to show that her SOCIAL SAVVY® brand has developed goodwill in the etiquette instruction industry. Ms. Ré can also show that defendants knew about her SOCIAL SAVVY® brand, disregarded her rights and instead sought to capitalize on her hard work. Because a reasonable person could conclude that the parties' marks are identical, are sold in the same market, through the same trade channels and to the same prospective purchases, there are triable issues about the likelihood of forward confusion.

Moreover, even if defendants could convince a trier of fact that the disputed evidence does not show that they sought to capitalize on Ms. Ré's goodwill, there is also an issue of "reverse confusion." Under the reverse confusion doctrine, courts recognizes that when a large

- 22 -

junior user saturates the market with a trademark identical or similar to that of a smaller senior user, the junior user can destroy the senior user's brand. See Sands, Taylor, 978 F.2d at 957-58 and n.12 (adopting reverse confusion doctrine). The result of such saturation is that the plaintiff loses the value of her trademark – its product identity, corporate identity, control over her goodwill and reputation, and ability to move into new markets. Id. Thus, in Sands, Taylor the Seventh Circuit held that the maker of Gatorade's use of the phrase "Thirst Aid" was reverse confusion to the small Vermont company that trademarked the phrase. 978 F.2d at 957. This was the case even though the Vermont company did not even have a product on the market, but rather only plans to market a product. Id. at 958-59. See also Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1372 (10th Cir. 1977) (finding that if big companies were able to use a smaller user's mark the logical consequence would be to immunize large companies from unfair competition liability because they have the economic power to advertise for a product name taken from a competitor).

Finally, defendants' claim that their infringement is entitled to greater leeway because it involves a book title is simply misguided. The First Amendment cannot protect a defendant who uses another's trademark in such a manner that there is likelihood of confusion. See, e.g., United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc., 128 F.3d 86 (2d Cir. 1997) (a use of a mark that causes confusion in the marketplace is not entitled to First Amendment protection). Here the defendants' claim rings particularly hollow because the products they are selling — etiquette instruction books — have a pure commercial purpose, they directly compete with Ms. Ré's SOCIAL SAVVY® brand etiquette instruction products and defendants use SOCIAL SAVVY® in a purely gratuitous manner.

2.    *Material Issues of Fact Exist Regarding a Likelihood of Confusion*

The eight factors that this court must examine to determine likelihood of confusion are
(1) the similarity of marks; (2) the similarity of the goods; (3) the relationship between the
parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of
prospective purchases; (6) evidence of actual confusion; (7) the defendants; intent in adopting
the mark; and (8) the strength of the mark.  Boston Athletic Ass'n v. Sullivan, 867 F.2d 22 (1st
Cir. 1989).  Here, genuine issues of material fact exist for every factor of this analysis.

a.    The marks are confusingly similar.

Defendants' argument that these marks are not similar because the overall cosmetics of
the parties' books are dissimilar ignores the obvious.  The parties marks are similar because
defendants used the *identical* words "SOCIAL SAVVY®" on the cover of their etiquette
instruction books that Ms. Ré uses for her SOCIAL SAVVY® brand etiquette instruction
products, including her book.

Defendants attempt to simply wish away Ms. Ré's SOCIAL SAVVY® etiquette
instruction work beyond her book is misplaced.  Ms. Ré uses her SOCIAL SAVVY® mark with
all of her etiquette instruction work.  Ré Depo. P. 45.  Where, as here, the products are closely
related or directly competitive, courts usually find that the degree of trademark similarity
necessary to establish likelihood of confusion is thereby lessened.  2 Gilson, Trademark
Protection and Practice, § 5.05 [1].  Here, a reasonable trier of fact could find the marks are
identical.  Where an infringer uses an *identical* mark, "whether the products are shoes, canned
peaches, or tractors, the public is very likely to assume they originate with the plaintiff or are
sponsored by or associated with [her]."  Id.

Even accepting defendants' argument that they use SOCIAL SAVVY® within a broader
context, a question of fact still exists: is defendants' use of SOCIAL SAVVY® the defining

- 24 -

feature of their titles? Its bold cursive style, highlighted and shiny color make it clear that it is. Moreover, Ms. Smith's name, which appears in very small print at the bottom of the book does not eliminate a likelihood of confusion. As the court found in R.J. Toomey, a reasonable trier of fact can conclude similarity is quite strong when defendant uses the mark as the dominant feature of defendants' products. 683 F. Supp. at 876. See also, Calamari Fisheries, Inc. v. Village Catch, Inc., 698 F. Supp. 994, 1009 (D. Mass. 1988) (stating that in considering the similarities of marks, courts emphasize the dominant portion of the marks); Edison Bros. Stores, Inc. v National Dev. Group, Inc., 1992 U.S. Dist. LEXIS 2839, at *7 (D. Mass. Mar. 6, 1992) (where the allegedly infringing term is so similar to the trademark at issue, the remaining language in the title and the display of the mark is less significant.)

Furthermore, defendants have not merely used the phrase SOCIAL SAVVY® as the dominant feature of the title of their books, they have embarked on a significant marketing effort that included press releases and interviews. As a result, defendants have repeatedly used the term SOCIAL SAVVY® orally and in black and white copy. See Curto Aff., Exh. F. These uses are virtually indistinguishable from Ms. Ré's use of SOCIAL SAVVY® to brand her etiquette instruction. These additional uses only increase the similarity of the marks. See Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 45 (D. Mass. 1995) (rejecting defendant's argument that marks were different because of a color scheme when there was evidence that defendant's marks do not always appear in color).

      b.      Defendants' Books Are All Goods Related To The Etiquette Instruction Market.

Ms. Ré's business, Ms. Smith's business and the Social Savvy guides all are related to the same industry: the etiquette instruction market. Defendants attempt to distinguish the parties' relevant markets by claiming that their target audience, adults, is a different target market than

- 25 -

Ms. Ré is simply disingenuous. First, one of the defendants' books states within its title that it is meant for "Girls." <u>See</u> Curto Aff., Exh. I. Furthermore, even accepting defendants' characterization that the books are targeted to people 18 and over, Ms. Ré provides her services to adults, teenagers and corporate clients. Ré Depo. p. 30  Some of Ms. Ré's adult seminars include "SOCIAL SAVVY® for Business" and "SOCIAL SAVVY® Weddings." Ré Depo. p. 122. In the past, she has regularly provided adult etiquette SOCIAL SAVVY® etiquette instruction at the Palace Hotel, the Short Hills Hilton and the Hyatt in Greenwich, Connecticut. Cotter Aff. ¶ 3; Ré Aff. ¶ 4. Thus, there is substantial overlap between the parties target audience.

<blockquote>c.     <u>The Parties Trade Channels and Prospective Purchasers Overlap</u></blockquote>

Defendants again offer a strained attempt to distinguish their etiquette instruction books from Ms. Ré's brand of SOCIAL SAVVY® etiquette products by maintaining that she serves only teenagers and young adults. As set forth, Ms. Ré's SOCIAL SAVVY® brand etiquette instruction serves a much broader client base, including the persons defendants admit they targeted with their books. Thus, whether the parties serve the same prospective purchasers is a disputed material issue of fact.

Defendants also state that the parties have different trade channels because Ms. Ré's book is only available in remainder and bargain book bins. Def. Memo. p. 20. This is simply not true. B&N, in fact, still has copies of Ms. Ré's book on hand at some of its stores. <u>See</u> BN02227-BN02228, listing books on hand, Curto Aff., Exh. D. Within the last 52 weeks B&N has sold at least 136 copies of Ms. Ré's book. <u>Id.</u>

<blockquote>d.     <u>There Is Evidence Of Actual Confusion.</u></blockquote>

"A showing of actual confusion is not essential in order to find a likelihood of confusion." <u>Supercuts, Inc. v. Super Clips</u>, 1990 U.S. Dist. LEXIS 189994, *10-*11 (D. Mass.

Oct. 26, 1990) (quotations omitted).  In fact, even in the absence of actual confusion, courts can

presume a likelihood of confusion where the marks are similar and the products are sufficiently

related.  See e.g., Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 818 (1st Cir.

1987) (affirming injunction and agreeing with district court that "lack of actual confusion has

been held to be prejudicial, however, only when the goods or services of the parties have other

substantial disparities"); Northern Light Tech., Inc. v. Northern Lights Club, 97 F. Supp. 2d 96,

113 (D. Mass. 2000) (granting preliminary injunction and noting that "while proof of actual

confusion is important, the lack of actual confusion is meaningful only in cases where marks

have been side-by-side in the same market for long periods of time or when goods or services

have substantial disparities").  See also Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.,

339 F. Supp. 2d 944, *44 (W. D. Mich. 2004) (stating that the Lanham Act is concerned with

potential confusion and thus plaintiff's claim will survive even without any evidence of actual

confusion).  Here, because defendants use Ms. Ré's identical mark to sell competing products in

the same market a trier of fact could reasonably presume confusion.

Moreover, even a " minimal demonstration of actual confusion" "supports a likelihood

of confusion." Edison Bros., 1992 U.S. Dist. LEXIS 2839 at *10.  In fact, courts have found that

even a single instance of confusion can support a plaintiff's claim of likelihood of confusion.

See, e.g., Supercuts, 1990 U.S. Dist. LEXIS 18994 at *12 (finding likelihood of confusion based

on totality of circumstances, including one instance of actual confusion); Louisiana World

Exposition, Inc. v. Logue,  746 F.2d 1033, 1041 (5th Cir. 1984) (finding evidence of confusion

sufficient even though only offered by one witness).

Here plaintiff provides sufficient evidence that actual confusion exists.  On four separate

occasions at four different B&N bookstores, clerks at those stores recommended Ms. Smith's

- 27 -

book when asked about a SOCIAL SAVVY® etiquette book. See page 9-10. On one occasion a B&N clerk recommended Ms. Ré's book. This evidence clearly shows that defendants own bookstores are confused by their use of Ms. Ré's SOCIAL SAVVY® mark.

> e.  Defendants' Intent In Adopting The SOCIAL SAVVY® Mark Supports A Finding Of Confusion

Numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer. Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258-59 (2d Cir. 1987) at 259; see generally 2 J. McCarthy on Trademarks, § 23:33 ("Where we can perceive *freedom of choice* with full knowledge of a senior user's mark, we can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well-known mark."). Failure to avoid this duty by adopting a senior user's mark is, by itself, evidence of bad faith. Id.

As described above, Ms. Ré has offered sufficient evidence to show that defendants acted with prior knowledge of Ms. Ré's mark when they published the Social Savvy guides. See pages 19-21. Defendants' failure to check if SOCIAL SAVVY® was trademarked further evidences their disregard for Ms. Ré's trademark rights. Einhorn Depo. p. 53-54; Smith Depo. pp. 40-41 Thus, there is abundant evidence for a trier of fact to find defendants acted in bad faith. See, e.g., Beer Nuts v. Clover Club Foods Co., 805 F.2d 920, 927(10th Cir. 1986) (noting that "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion"); Wynn Oil Co. v. American Way Serv. Corp., 943 F.2d 595 (6th Cir. 1991) (finding intentional infringement and noting that "courts have held that use of a mark with knowledge of another's prior use supports an inference of intentional infringement").

- 28 -

f.    Ms. Ré's SOCIAL SAVVY® mark is sufficiently strong.

In assessing relative strength of a mark, courts consider its inherent distinctiveness and the distinctiveness of it in the marketplace. See Streetwise Maps v. VanDam, Inc., 159 F.3d 739, 743-44 (2d Cir. 1998). Because an analysis of the distinctiveness of a mark is so fact specific, courts often deny a motion for summary judgment on the ground that the strength of a mark can only be determined at a full fact-finding trial. Travel Magazine, Inc. v. Travel Digest, Inc., 191 F. Supp. 830, 833 (S.D.N.Y. 1961) (denying defendant's motion for summary judgment finding secondary meaning can only be determined at trial). See also 5 McCarthy on Trademarks § 32:117. As discussed at length above, Ms. Ré has offered sufficient evidence that her mark is suggestive and that it has acquired secondary meaning in the etiquette marketplace. See pages 14-17. This evidence, at a minimum, sufficiently shows the strength of Ms. Ré's mark such that summary judgment would be inappropriate. See R.J. Toomey, 653 F. Supp. at 878.

## C.    Defendants Cannot Obtain Summary Judgment On Ms. Ré's State Claims

A fundamental difference between federal trademark law and Mass. Ch. 110B, § 12 — which defendants do not address — is that there is no requirement to show a "likelihood of confusion" to prevail. Instead, Ms. Ré will prevail under her claim if she shows that defendants have caused an injury to the distinctive quality of her mark. Mass. Gen Laws Ch. 110B, § 12. Factors this Court must consider to determine whether defendants' use of her SOCIAL SAVVY® mark have caused injury are (1) similarity of the marks and products; (2) the renown of the marks; (3) intent of the defendants and (4) the relevant customers. Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 137 (D. Mass 1999). As set forth above, Ms. Ré has demonstrated material issues of fact as to each of these factors. Accordingly, she is entitled to a trial under the Massachusetts anti-dilution statute.

- 29 -

Similarly, defendants' dilution of Ms. Ré's mark under Ch. 110B, § 12 — particularly when coupled with their bad faith intent — is sufficient to show a claim under Mass. Gen. Laws Ch. 93A claim. See PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593 (1975) (liability accrues under 93A claim whenever a party's conduct constitutes some element of unfairness). Ms. Ré has set forth sufficient evidence related to defendants' dilution and their bad faith to sustain her 93A claims.

Moreover, Ms. Ré has also provided sufficient evidence regarding likelihood of confusion to sustain her trademark infringement claims. As set forth, a reasonable person could conclude that there is a likelihood of confusion because the parties' marks are identical, are sold in the same market, through the same trade channels and to the same prospective purchases. Accordingly, Ms. Ré has also provided sufficient evidence to sustain her Ch. 93A claim based on defendants' infringement of her trademark.

## III.    CONCLUSION

For all the above reasons, this Court should deny Defendants' Motion for Summary Judgment.

JUDITH RÉ

By her attorneys,

Edward P. Leibensperger (BBO #292620)
Daniel A. Curto (BBO # 639883)
Heather Egan-Sussman (BBO # 648192)
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, Massachusetts  02109
(617) 535-4000

**CERTIFICATION OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 12/13/04

Dated:  December 13, 2004

BST99 1438024-1.071236.0011